# CHARLESTON.

## KUNST *et al.* v. MABIE *et als.*

Submitted March 5, 1912.   Decided March 18, 1913.

1. INJUNCTION—*Cutting Timber—Solvency of Trespasser.*
    Equity has jurisdiction, at the suit of a land owner, to enjoin cutting of timber, regardless of the solvency or insolvency of the trespasser. (p. 207).

2. LOGS AND LOGGING—*Abandonment by Purchaser—Reversion of Title.*

The purchaser of standing timber, with right of removal for a limited time, may abandon his right before the expiration of the time agreed upon for removal, in which case the title to the uncut timber reverts to the land owner.  (p. 208).

3. SAME—*"Abandonment" by Purchaser—What Constitutes.*

Abandonment is largely a matter of intention, and intention is generally proven by visible acts and conduct. Actual surrender of a chattel right, coupled with an intention to abandon it, constitutes legal abandonment.  (p. 208).

4. SAME—*Abandonment by Purchaser—What Constitutes—Evidence.*

Certain facts and circumstances stated, in the opinion. held sufficient to prove abandonment of the right to cut and remove timber, before the expiration of the time allowed by the contract of purchase.  (p. 208).

Appeal from Circuit Court, Randolph County.

Suit by Hattie A. Kunst and others against Nancy A. Mabie and husband to enjoin the cutting of timber. From decree for defendants, plaintiffs appeal.

*Reversed and Rendered.*

*D. H. Hill Arnold* and *W. B. Maxwell,* for appellants.
*Samuel V. Woods,* for appellees.

WILLIAMS, JUDGE:

This suit was brought by Hattie A. Kunst and a number of others against Nancy A. Mabie and W. H. Mabie, her husband, to enjoin the cutting of timber claimed by defendants, mediately, by conveyances from plaintiffs, on about 6,000 acres of land in Randolph county. The judge, in vacation, granted a temporary injunction, but on final hearing on the 23rd of May, 1911, the circuit court of Randolph county dissolved the injunction and dismissed the bill, and plaintiffs obtained this appeal. Defendants claim title to the timber and the right to cut and remove it by virtue of a sale made by plaintiffs to W. H. Mabie, John G. Stephenson and Alexander McClure, in the year 1895. Plaintiffs admit said sale, but contend that Mabie, McClure and Stephenson, and those claiming under them, have long since cut

over the land and abandoned any timber that was then left standing, and that defendants have no right to make a second cutting under a pretended purchase from the original vendees of the timber. They aver that defendants are now proceeding to cut a new growth of timber from the land.

In 1895 plaintiffs sold and conveyed to the aforesaid Mabie, McClure and Stephenson, all the timber above the size of ten inches in diameter at the stump, on a number of adjacent tracts of land, aggregating over 6,000 acres, situate on the waters of Roaring Creek and the tributaries of Middle Fork river, in Randolph county, giving them twenty-five years within which to cut and remove it. The purchase price was about $77,000, the last installment of which was payable the 11th of September, 1899. The cutting was to commence not later than three years from the date of the sale, and the timber was to be removed with reasonable diligence, but, in no event, was the time for removal to extend beyond twenty-five years. When boundaries of 500 acres were cut over, possession of them was to be surrendered to the grantors, and thereafter the purchasers had the right of way over such boundaries, for the purpose only of removing timber from other portions of the land. The purchasers were to pay one-fourth of the taxes assessed on the land from, and including, the year 1895, during the time they should be engaged in removing the timber, unless the whole of the taxes exceeded $800 in any year, in which event they were to pay only $200. As fast as the timber was cut and removed from parcels of 500 acres, and possession thereof delivered to plaintiffs, the purchasers were to be relieved from the payment of their part of the taxes, in the ratio that the quantity of land cut over bore to the whole boundary. When lumbering operations commenced on any particular part of the boundary, the purchasers were bound not to "abandon nor suspend for any unreasonable length of time the cutting and removing of timber thereat, until all they are entitled to remove therefrom in that vicinity shall be taken so far as practicable, until the timber on a boundary of at least five hundred acres shall be cut and removed, and the land abandoned as hereinbefore stated."

Before lumbering operations commenced, Mabie, McClure and Stephenson obtained a charter and formed a corporation, the

stockholders in which were themselves and other members of their families.  On the 16th of August, 1897, they sold to the corporation so much of the timber as it could cut and manufacture into lumber within six months, but not to exceed six millions feet, board measure.  By the terms of that sale, the cutting was to commence on Roaring Creek, where said corporation was then building its railroad, and the company was bound by its contract of purchase to cut the timber "clean down to ten inches in diameter at the butt and running well into the tops, and extending back to cover and include the hollows and gullies leading into Roaring Creek, and so as to include all timber the natural outlet of which is the Roaring Creek valley."  It was also required to cut and remove the timber "in a compact and contiguous body."  Payment was to be made by the thousand feet, scale measure, as follows, viz: $1.50 per M. for chestnut and maple; $4.00 per M. for all kinds of oak, poplar and all other hardwoods except chestnut and maple; oak cross-ties 10c each and all other kinds 8c each.  All such rights as were given to Mabie, McClure and Stephenson by their vendors, for the purpose of operating on the land, were granted by them to the company.  Cutting was to begin not later than the 1st of November, 1897.  This contract was extended a number of times by mutual consent, until 2nd May, 1901, when a new sale was made to the company of "all of the timber" on the Goff and Arnold tracts of land.  By this sale there was transferred to the company all the rights which had been granted to Mabie, McClure and Stephenson by these plaintiffs.  It was to pay for the timber by scale measure, as follows, viz.: $3.00 per M. for poplar, white oak and chestnut oak; $1.00 per M. for all chestnut, hemlock, birch, beech and maple; and 5c a piece for oak cross-ties and 3c a piece for all chestnut ties.  The company was bound to begin cutting within thirty days from May 2, 1901 and to cut and remove the timber at the rate of not less than three million feet per year, and to cut and remove all of it within five years from that date.

William Whitmer & Sons, a West Virginia corporation residing in Philadelphia, and W. H. Mabie acquired nearly all the capital stock of the McClure-Mabie Lumber Company, each owning about one-half.  Robert F. Whitmer was president, Martin

Lane treasurer, and W. H. Mabie general manager of the company, Mabie managing the lumbering operations in Randolph county and Whitmer and Lane having charge of the sales department in Philadelphia.

The cutting began late in 1897, or early in 1898, and continued, except for a short period in 1898 when the company had the misfortune to lose one of its mills by fire, under the various contracts, until 1904. The McClure-Mabie Lumber Company had leased ground adjacent to the timber territory, and had built, and operated two or three saw-mills, one of which had a capacity for sawing fifty thousand feet of lumber per day; it had built railroads up the streams into the timber, and, before its business was wound up by suit, as hereinafter explained, it had cut over all the land, except a strip along the western boundary line, variously estimated to contain from 300 to 500 acres, title to which appears to have been in litigation between these plaintiffs and an adjoining land owner.

In 1904 W. H. Mabie brought a suit in the circuit court of Randolph county against the McClure-Mabie Lumber Company and R. F. Whitmer, president, and Martin Lane, treasurer, for the purpose of winding up the affairs of the corporation. All the property of the McClure-Mabie Lumber Company, including its milling plant, buildings upon the leased premises, steel rails, locomotives, engines and cars, and all tools and appliances used by it in its lumbering business, were sold pursuant to decree in that cause. But no timber on the Goff and Arnold lands was sold.

Claiming that the timber had not been cut clean from any portion of the large boundary of land, but that only the best and most valuable part of it above ten inches in diameter had been cut, and claiming that all the timber remaining upon the land, above that size, still belonged to himself and to his two original joint purchasers, W. H. Mabie purchased, for his wife, Nancy A. Mabie, from Alexander McClure and Elizabeth Y. Stephenson, the widow and devisee of John G. Stephenson, deceased, their respective interests in it. Their deed to her, made the 8th January, 1906, recites the consideration to be $1,200, and that it is to be paid as follows: $50 on the first day of the month following the month in which the grantee shall begin to

cut the timber; $50 on the first day of the next following month; and $100 per month thereafter, until the whole $1,200 is paid. It also recites that most of the timber had been cut and removed by the McClure-Mabie Lumber Company, but that owing to a dispute over the boundary line between Kunst, Arnold and others, and the adjoining land owner, along what is known as the Laidley line, no timber had been cut on the disputed boundary, containing between 400 and 500 acres. Reciting that the disputed boundary was in litigation, the deed provided that, if the litigation resulted in the loss of the timber, Nancy A. Mabie was to have an abatement of $1,150, from the purchase price. Or, in other words, she was then to pay only $50 for two-thirds of the balance of the timber on the 6,000 acres boundary. W. H. Mabie claims to own the other undivided third under the original purchase from plaintiffs. And, under the claim that the timber had not been cut on any portion of the land, as closely as the purchasers had the right to cut it, and that the twenty-five years, within which they had a right to cut and remove it, has not expired, defendants began to rebuild railroads on the land, and to re-cut the timber; and plaintiffs seek, by this suit, to enjoin them.

The bill does not seek to restrain the cutting of timber on that portion of the boundary, known as the disputed strip, and on which no cutting has been done; defendants' right to the timber on it is admitted. Plaintiffs are seeking to prevent any further cutting only upon land heretofore cut over.

All the land, except the disputed strip, was cut over by the McClure-Mabie Lumber Company prior to the summer of 1904, but it clearly appears that there is yet a good deal of standing timber on the land, that was above ten inches in size at the time the cutting was done. The quantity of such timber is variously estimated by different witnesses.

That equity has jurisdiction, at the suit of a land owner, to enjoin the cutting of timber, without regard to the solvency or insolvency of the trespassser. is settled by recent decisions of this Court. *Pardee* v. *Lumber Company,* 70 W. Va. 68, 73 S. E. 82; *Metallurgical Co.* v. *Montgomery,* 70 W. Va. 754, 74 S. E. 994.

The real question in the case is, was there an abandonment of the right to enter upon the land and again cut over it? Defend-

ants contend that, at the time the first cutting was done, the condition of the market was such, that the smaller sizes and inferior grades of timber would not pay the expense of cutting and manufacturing, and, for that reason, it was purposely left until some future time when the condition of the market would be better. They contend that the market has very much improved, and that there is now a demand for all kinds, grades and sizes of timber; and that they never abandoned the right to make a second cutting. The purchase of the timber, with right to cut and remove it in a limited time, creates a chattel real; it is not a corporeal hereditament, and may, therefore, be lost to the owner by abandonment, like a lease for a term of years. Legal abandonment is largely a matter of intention. But intention is generally proved by subsequent acts. The purpose is generally conceived before the act is performed, and is seldom declared in advance of it. Hence the intentions of men generally have to be determined by their acts. Intention to abandon, coupled with a surrender of possession, or what is equivalent thereto, constitutes legal abandonment. *Smith* v. *Root,* 66 W. Va. 634; *Garrett* v. *Oil Co., Id.* 587; *Harris* v. *Michael,* 60 W. Va. 356.

By their deed of May 2nd, 1901, McClure, Mabie and Stephenson sold and conveyed to the McClure-Mabie Lumber Company all the timber on the Goff-Arnold lands, and bound it to cut and remove it within five years from that date and they transferred to it all the timber and lumbering rights which they had acquired from these plaintiffs; and if it cut over the land and abandoned part of the timber as worthless, it reverted to plaintiffs, and neither McClure, Mabie and Stephenson, nor their subsequent grantees, have the right to re-enter upon the land for the purpose of making a second cutting.

We think it is clearly established by a number of facts and circumstances in the case, that the McClure-Mabie Lumber Company did actually abandon all the timber which was left standing on the land over which it had cut prior to the summer of 1904. The bill filed by Mr. Mabie, as one of the stockholders, and general manager, of the company, averred that it had "cut out its timber and finished its work, (had) shut down its mills, discharged nearly all of its employees and ceased to carry on its operations;" and this averment was expressly admitted by it

in its answer. Its business was wound up and all its property sold by decree of the court. That clearly proves an abandonment by the corporation of any timber that might then have been remaining upon the land. The following facts and circumstances moreover show that Mabie, McClure and Stephenson also understood, and acquiesced in, the abandonment of all uncut timber on bodies of land which had been cut over. On the 29th March, 1904, application was made, on their behalf, to the county court to be relieved from the taxes assessed on three tracts, 1,318 acres, 240 acres and 250 acres in Roaring Creek district, for the year 1903, and the relief was granted. The order exonerating them from the payment of the taxes recites, that evidence had been adduced to satisfy the court that the applicants were not then the owners of the timber, that it had been cut and removed prior to 1st April, 1903. It appears from the testimony of Mr. Bowers, the attorney who presented the matter to the court, and from press copies of letters furnished by him, that Mr. Mabie was himself the party who made the application, and that he did it on behalf of himself and his associates, McClure and Stephenson. Mr. Mabie must, therefore, necessarily have furnished the evidence to satisfy the court that it was proper that they should be released from the tax. Those three tracts of timber appeared on the land books, for the year 1900, as tracts containing, respectively, 1,945 acres, 370 acres, and 383 acres; and it is shown by the testimony of Mr. J. C. Godden, the assessor, that he reduced the area, on account of the fact that large bodies of timber on the several tracts had then been cut and removed from the land. But before doing so, he says he not only went upon the land, but that he also consulted with Mr. Mabie, and that Mr. Mabie showed him a plat of the lands and indicated thereon what proportion of the tracts had been cut over, and that he then reduced the acreage accordingly one-third. The lands were returned delinquent for the non-payment of taxes assessed for the years 1904, 1905, and 1906, and were redeemed by Mr. Mabie, after his wife's purchase from McClure and Mrs. Stephenson, and were thereafter assessed at a valuation of $1.00 per acre. But if title was lost by abandonment, it could not be re-acquired by payment of delinquent taxes, and having the land re-entered on the land books.

Again, there appears to have been a dispute, at one time, as to what proportion of the taxes for a particular year should be paid by Mabie, McClure and Stephenson, and on 13th August, 1901, Mr. Mabie wrote to C. F. W. Kunst, one of the plaintiffs, at Grafton, West Virginia, calling his attention to that clause in the timber deed which defines the proportion of taxes that the purchasers were to pay, and directing particular attention to that provision relating to the cutting of the timber in parcels of 500 acres each, and says: "Now this would have relieved us of quite an amount of taxes after the first year that we began operation, and for the last one of two years quite an amount as we have now gone over some 2500 acres including barrens and firebreaks; however in making out the statement we thought, as we had been treated very nicely by all you parties that it would not become us to split hairs about the taxes."

A potent circumstance, indicating that Mrs. Nancy A. Mabie regarded the timber on the cut-over land as of little or no value, or as having been abandoned, is the condition in the conveyance to her, respecting the price she is to pay in the event the disputed strip is lost. In that contingency she was to get two-thirds of the timber on all the balance of the land for $50. Six thousand acres of timber valued at the paltry sum of seventy-five dollars! However, if McClure and Mrs. Stephenson really owned the two-thirds, the insignificant price at which they sold it, is not a matter of which these plaintiffs can complain. But it is important as indicating a previous abandonment by the vendors, and indicates that the timber on the disputed strip was all they regarded of any value, and simply added a kind of dragnet provision as to the cut-over land in order that Mrs. Mabie might take chances on it. But, as abandonment is largely a matter of intention, it follows that if they thought they did not own it, they had both in fact and in law abandoned it.

The foregoing facts and circumstances prove beyond question, we think, that Mabie, McClure and Stephenson, and those claiming under them, had cut all the timber on all the boundary of land which they considered worth cutting, and thereupon abandoned all the timber that remained, except the timber upon the boundary of four hundred or five hundred acres along the western boundary line, known, and spoken of, as the "disputed strip,"

and from which the right of defendants to cut and remove the timber, is admitted by plaintiffs.

The intention to abandon is not in anywise affected by the fact that about $10,000 of the purchase money due plaintiffs was not paid until 1907. That portion of the money was withheld because of the pending litigation over the boundary line, between plaintiffs and the heirs of Samuel Woods, deceased.

Nothing said in this opinion is intended to affect the right of Mabie to recover from plaintiffs the amount of taxes paid to redeem the land, if such right exists. Because that question does not arise upon the pleadings and is not passed upon by us.

The decree of 23rd May, 1911, will be reversed, and an order entered here reinstating plaintiffs' suit and perpetuating the injunction awarded by the judge in vacation on the 14th July, 1909.

*Reversed and Rendered.*