# CHARLESTON.

[Nos. 4236 to 4243]

SALLIE M. BENNETT *et al. v.* THE INTERSTATE COOPERAGE Co. *et al.*

URSLEY J. OFFUT *v.* C. N. SNODGRASS *et al.*

E. L. J. SMITH *v.* C. N. SNODGRASS *et al.*

ELLIOTT CHENOWETH *v.* C. N. SNODGRASS *et al.*

H. E. CRAWFORD *v.* C. N. SNODGRASS *et al.*

CHARLES LAUGHLIN *v.* C. N. SNODGRASS *et al.*

R. B. EISMAN *v.* C. N. SNODGRASS *et al.*

W. T. CRAWFORD *v.* C. N. SNODGRASS *et al.*

Submitted October 5, 1921.   Decided October 18, 1921.

1.  LOGS AND LOGGING—*Grant of Timber with Right to Remove Held to Vest Irrevocable Right in Grantee.*

   A deed granting the timber upon a tract of land with the right to cut and remove the same within a definite time, upon a substantial pecuniary consideration, vests in the grantee and his assigns an irrevocable right to do the acts contemplated in such deed. (p. 288).

2.  SAME—*Cessation of Operations by Grantee of Timber on Land Held Not as Abandonment.*

   A right so conferred is not lost or terminated by cessation of timber operations upon the land for a few months,

89 W. Va.

and by the removal therefrom of the mills and tramroads used for such timber operations, nor by the failure of the owner of such timber to have it entered upon the land books and charged with taxes for one year. In order to work an abandonment of such right the facts and circumstances relied upon for that purpose must show a clear intent on the part of the owner of such timber to permanently forego any further right or interest therein. (p. 297).

3. SAME—*Provisions in Deed of Timber That Purchaser Shall Surrender Certain Acreage Each Year May be Waived by Grantor's Failure to Enforce.*

A provision in a deed conveying the timber upon a large tract of land, that the purchaser shall surrender back each year a certain acreage of said land, together with the timber remaining thereon, may be waived by the grantor in such deed, and such a waiver may arise from such grantor not enforcing such provision in consideration of which he is relieved of an obligation which he is under to the grantee to provide rights-of-way for removing the timber. (p. 298).

Appeal from Circuit Court, Calhoun County.

A suit by Sallie M. Bennett and others against the Interstate Cooperage Company, and suits by Ursley J. Offut, by E. L. J. Smith, by Elliott Chenoweth, by H. E. Crawford, by Charles Laughlin, by R. B. Eisman, and by W. T. Crawford, against C. N. Snodgrass and others, in each of which there was a decree for the plaintiffs, and the defendants appealed. The suits were considered together.

*Reversed; Injunctions dissolved; Remanded.*

*R. F. Kidd, L. H. Barnett,* and *Blue & McCabe,* for appellants.

*A. G. Mathews,* for appellees.

RITZ, PRESIDENT:

By these suits the plaintiffs seek to enjoin the defendants from cutting and removing any of the timber from a tract of 27000 acres of land situate in Braxton, Gilmer and Calhoun counties. They are controlled by the same legal principles, for which reason they will be considered together.

On the 11th of July, 1906, Louis Bennett, W. G. Bennett, Gertrude B. Howell and Mary B. Bowie conveyed to the de-

fendant Interstate Cooperage Company all the timber on a tract of a little more than 27000 acres of land situate in Braxton, Gilmer and Calhoun counties. This deed included by its terms all the timber on said land that the purchaser might desire to remove except fruit trees and shade trees in the yards or curtilages of the houses thereon. The conveyance then contained conditions and provisions in regard to the removal of the timber as follows: ''It is, however, expressly understood and agreed that second party is to examine such land as may heretofore have been improved, or from which the timber may have been wholly or partly removed, and on or before January 1st, 1909, by metes and bounds surrender such timber as then remains upon the same as it may in fairness regard to be without merchantable value. And in addition thereto said second party shall by said January 1st, 1909, remove the timber from at least two thousand acres in addition to that surrendered as improved or timberless land, and surrender back to first parties, their heirs or assigns, all timber remaining on said two thousand acres, which is to be designated by metes and bounds if first parties desire it. First parties are to pay the cost of surveying all land surrendered to them.

And second party is also each year after January 1st, 1909, to remove the timber from at least fifteen hundred additional acres of said land, to be removed from reasonably compact parcels thereof, though they need not adjoin each other, and the timber then remaining on said parcels is yearly from said January 1st, 1909, to be surrendered back to first parties, their heirs or assigns, by metes and bounds as aforesaid, as though it had never been sold by them. And it is also expressly understood and agreed that all timber that may remain on said boundaries from which it is hereby conveyed after January 1st, 1925, shall without further notice or motion and by force and effect hereof revert back and belong to said first parties, their heirs or assigns, as though it had never been sold; and all rights, interests and privileges of second party, its successors or assigns, in any timber thereon not then removed shall totally cease thereafter.''

The primary purpose of the defendant Cooperage Company

in acquiring the timber on this tract of land was to secure so much thereof as was fit to be manufactured into barrel staves and headings. Immediately after the conveyance aforesaid the Cooperage Company began its operations on the land. It went over it and cut the oak timber in large quantities, constructed railroads so as to remove said timber to its various mills, erected on the lands, and the manufactured product from the mills to the point of shipment. It also during the time sold considerable quantities of timber besides that suitable for staves and headings. It will be observed that the deed provides that by the first of January, 1909, the said Cooperage Company shall surrender by metes and bounds to the grantors the timber on such of the lands as it may in fairness regard to be without marketable value, and also 2000 acres of the land in addition to this, and on the first of January of each year thereafter 1500 acres of such lands, and that the right of the Cooperage Company to cut and remove the timber from said land will expire on the first of January, 1925, and all timber then remaining uncut upon said land at that time revert to and become the property of the grantors. The Cooperage Company did not on the first of January, 1909, execute any deed of surrender for such of the lands as it found were improved and the timber thereon not of marketable quality. It is shown that at the time the transaction was made it was estimated that there was about 2000 acres of the land which had been cleared and improved, and that there was a deduction made from the purchase price of $30,000.00 to cover this 2000 acres at $15.00 per acre, the price at which the timber was purchased. Nor did the said Cooperage Company surrender 2000 additional acres of the land from which it had cut the timber at that time, nor did it surrender 1500 acres on the first of January of each year thereafter.

The Cooperage Company's operations upon the land commenced in Braxton county, and, as the timber was removed from the land in that county, extended into Gilmer county, and thence into Calhoun county. In 1913 Louis Bennett, who, it appears, conducted all of the transactions for the grantors in the deed, took up with the Cooperage Company the

matter of surrendering some of the lands, the timber upon which had been conveyed to it.　It was the dseire of the parties, if possible, to make such surrender without being put to the expense of making additional surveys.　While the large tract of more than 27,000 acres of land was in a comparatively compact body, it was made up of many smaller tracts, and the deed to the Cooperage Company conveyed the timber by the metes and bounds of these smaller tracts, and the parties desired to surrender as many of these smaller tracts described in the deed of conveyance as were ready to be turned back.　It was found at that time that the Cooperage Company had cut the timber off of all the lands lying in Braxton county except a small tract of about 40 acres.　These lands lying in Braxton county were made up of much smaller tracts than the tracts making up the lands in Gilmer and Calhoun counties.　The Cooperage Company advised Bennett that it could surrender back practically all of the lands in Braxton county, and he prepared a surrender deed to be executed by the Cooperage Company releasing unto the Bennetts certain tracts of land describing them by the metes and bounds given in the deed made by him and his associates to the Cooperage Company.　This deed as prepared by Bennett included between five and six thousand acres.　He sent it to the Cooperage Company for execution, and upon examination it was found that it did not contain all of the tracts which the Cooperage Company desired to surrender.　It was rewritten and made to include more than 7000 acres.　A provision was put in this deed, as prepared by Bennett, not waiving any of the rights of the grantors for failure of the Cooperage Company to make the surrenders as required by the terms of the deed, or to comply with any other provisions of the conveyance, and this provision was carried into the deed as rewritten, but in a little different form.　No further surrenders of the land, or any part thereof, had been made at the time of the institution of these suits.　It appears that in the year 1916 Bennett took up with the Cooperage Company the matter of making further surrenders, and it advised him that it was ready to surrender a very large part of the area, but that it could not do so from the descriptions contained

in the deed of conveyance to it, for the reason that the proper conduct of its operations did not permit cutting the timber clean on any one of the tracts of land, but involved large parts of a number of the tracts. It will be remembered that these boundaries in Gilmer and Calhoun counties were much larger than the boundaries in Braxton county, one of them containing something like 10,000 acres. Prior to this time Bennett had had most of the land cut up into smaller lots or tracts, with a view of selling the same for small farms. These tracts ranged in size from 15 to 200 acres. A map had been made showing these small farms by metes and bounds, and with a view to securing the surrender by the Cooperage Company of some of the lands without being required to make surveys, Bennett sent one of these maps to that Company, and asked it if it could therefrom pick out the lands from which it had cut the timber, and surrender the same according to the metes and bounds of the farms as shown by this map. After making an examination of the map the Cooperage Company's officers were able to point out but a very few of the small tracts which could be surrendered in accordance with the descriptions shown on the map. Bennett was advised of their inability to make the surrenders from the descriptions contained on the map, and of the necessity for making additional surveys to that end. He made no answer to this communication, and no further negotiations were had so far as is shown by the record in regard to the surrenders of the land, or any part of it, until after the death of Louis Bennett. In the year 1917 there was some correspondence between Bennett and the Cooperage Company, and its lawyer, in regard to securing rights-of-way for the purpose of removing the timber from certain parts of the land. There was a collateral contract at the time the deed was made by which the Bennetts agreed that they would furnish certain rights-of-way for the removal of the timber. Bennett's contention was that his contract did not require him to secure the rights-of-way demanded, while the Cooperage Company contended that he was under obligation to secure the same. This controversy seems to have been terminated in August, 1917, by a letter written by Bennett to

the Cooperage Company in which, among other things, he said: "But I am disposed to think that in the final adjustment of all matters my leniency toward you in not enforcing the surrender of timber territory, and your fairness and accommodation to me would, perhaps, offset each other and settle all such matters." It appears that no further demands were made for the rights-of-way in question, and the matter was there allowed to rest.

In the spring of 1918 the Cooperage Company had removed from the land all of the timber suitable for making staves and headings that was accessible to its tramroads and railroads. It had theretofore cut large quantities of the other timber and sold it to other parties, and had also sold considerable of the other timber upon the stump to other parties who cut and manufactured the same, but at this time there was still remaining on the land a considerable amount of valuable timber which the Cooperage Company determined to sell as a whole. At that time it was under a contract with Vansant Kitchen & Company to cut and deliver all of certain kinds of timber upon the lands at certain prices. Because of the increased cost of cutting the timber and putting it in the streams, this contract had become very burdensome, resulting in considerable loss to the Cooperage Company. Before, however, it could dispose of the remaining timber it was necessary to secure a cancellation of this contract. In March or April, 1918, the Cooperage Company agreed with the defendant Snodgrass to sell the remaining timber upon the land to him for the sum of $6500.00, conditioned, however, upon it being able to secure a cancellation of the Vansant Kitchen & Company contract. Negotiations were entered into with that company which resulted in September, 1918, in a cancellation of that contract upon the payment to that company by the Cooperage Company of the sum of $10,000.00, and on the same day the Cooperage Company executed the contract selling the remaining timber to Snodgrass.

In the spring of 1918 the Cooperage Company removed all of its mills from the land, took up its steel railroads, and had determined to discontinue its operations thereon. In the fall of 1918, after the transfer of the remaining timber

to the defendant Snodgrass, the defendant Turner acquired from Snodgrass a one-half interest therein, and they began operations with a view to the removal of this timber. The plaintiffs in the seven last above named suits had purchased from Louis Bennett and his associates small tracts of the lands included in the 27,000 acres, all of the deeds to them being made subject to the rights of the Cooperage Company in the deed of July, 1906. When Snodgrass and Turner began their operations the same extended upon the lands of these plaintiffs, and they, beginning in January, 1919, brought suits in equity for the purpose of enjoining Snodgrass and Turner from removing any of the timber from the tracts of land purchased by them, asserting that the Cooperage Company had lost its title to any of said timber because it had abandoned the same, and that when it made the deed to Snodgrass it had nothing to convey to him. A little later in the same year the plaintiffs in the first above entitled suit, being the grantors in the deed of July, 1906, and the successors to such of them as had in the meantime died, brought suit seeking to enjoin the timber operations. The basis of this suit is that the Cooperage Company had abandoned its timber rights, for which reason the deed to Snodgress was ineffective to pass any title to the timber, or any part thereof, and further that by the terms of the deed granting the timber to the Cooperage Company it was required to make surrender each year of 1500 acres, as well as of the improved land, and 2000 acres on the first of January, 1909, and that under this provision there should have been surrendered at the time of the institution of the suit at least 19000 acres of land, whereas there had only been surrendered some 7000 acres; that Snodgrass and Turner were attempting to cut over all of the land not actually surrendered by deed, whereas if they had any rights at all it would only be to so much of the land as would remain after taking out the total acreage which should have been surrendered up to that time.

Upon a hearing of the case the court below found that the Cooperage Company had not abandoned its timber rights, but that it still had title to some part of the timber upon said 27000-acre tract of land at the time it made the conveyance

to Snodgrass. He, however, perpetuated the temporary injunctions granted in the seven last above named cases, and held in the first above named case that Snodgrass and Turner would be entitled to cut timber from no more than about 8000 acres of land; that as they had gone upon the land and had cut timber from several of the tracts as described in the original deed of conveyance to the Cooperage Company, in the aggregate amounting to more that 12,000 acres, they had exceeded their rights. In arriving at this conclusion that Snodgrass and Turner had cut over more territory than they were entitled to the court charged them with the entire acreage of every tract of land as described in the original deed upon which they had carried on any operations, no matter how inconsiderable. To illustrate, there was one tract of land containing about 9000 acres. The timber remaining on about 3000 acres of this land was sold by Snodgrass and Turner to another party, and this other party was also given the privilege of cutting some trees which remained along the bank of a stream dividing the part sold from the part reserved for the purpose of surrender, and the court, because of the cutting of these few trees, held that Snodgrass and Turner had elected to take the whole 9000-acre tract as a part of the lands they were entitled to cut over.

It appears that when the plaintiffs in the seven last above named suits began to question the right of Snodgrass and Turner to cut the timber remaining on the lands sold to the company by the Bennetts, Snodgrass took up with the Bennetts the matter of making surrenders of such parts of the land as should have been surrendered up to that time. It appears that there was ample acreage from which the timber had been entirely removed to make up all of the lands which, by the terms of the deed, should have been surrendered, but that in order to make surrender deeds with any degree of accuracy considerable surveying would necessarily have to be done. These tracts of land which were laid off into farms were divided upon the theory of making them convenient for farming purposes, and it was not practicable to conduct the timber operations so as to entirely remove the timber from any such tract as the work progressed. Snodgrass asked the

Bennetts to have their surveyor go with him upon the ground with a view of determining the boundaries of such lands as could be surrendered. They directed a surveyor to go upon the ground, but instructed him that in accepting any surrenders from Snodgrass he must be required to keep as the part·of the lands upon which he was still entitled to cut the timber the whole area of any tract upon which he had theretofore carried on any operations, regardless of the extent of these operations, or of the area of the tract. Of course these instructions did not consist with the terms of the deed, and Snodgrass did not accede thereto. The surveyor, however, with Snodgrass, was engaged at the time the suits were brought in endeavoring to ascertain the boundaries of such lands as could be surrendered. After the Bennett suit was instituted the Bennett surveyor discontinued his activities, and Snodgrass and Turner continued to make such investigations as would enable them to surrender a considerable part of the land. As a result thereof a deed was prepared surrendering to the Bennetts what Snodgrass and Turner and their surveyor claim is over 12000 acres, and what the Bennett surveyor claims is a little more than 9000 acres. This surrender deed was filed by Snodgrass and Turner with their answer in this case, and is tendered as a full compliance with the requirements of the deed of July, 1906, by which the timber was conveyed by the Bennetts to the Cooperage Company. From the decrees of the circuit court above indicated Snodgrass and Turner prosecute these appeals.

The appellants contend that the conclusion of the circuit court that there had been no abandonment of its rights by the interstate Cooperage Company at the time of the transfer of the remaining timber by it to Snodgrass is well supported by the evidence, while the plaintiffs contend that this conclusion of the circuit court is wrong; that it should have held that the Interstate Cooperage Company had lost, by abandonment, its rights prior to the time it made the deed to Snodgrass, and should not only have perpetuated the injunctions in the seven last above named cases, but in the first above styled case as well. This contention that the Cooperage Company had abandoned its rights under the timber deed is

based upon the fact that it had taken up its tramroads and steel railroad tracks, and had removed its mills from the land in the spring of 1918, before the conveyance to Snodgrass, and that for that year it had directed the assessor of Calhoun county to omit from the tax books of that county any charge against it on account of standing timber, the representation being that the same had been removed; and further, upon certain statements made by various employes of the Cooperage Company that the company had completed its operations upon the tract of land and was moving out, or similar statements of like import.    It is quite true that the Cooperage Company did remove its mills and its railroads from these lands in the spring of 1918.    The mills upon the land were for the purpose of cutting staves and  headings, and when it had completed the cutting of this class of material, of course, it had no further use for these mills.    The tramroads and railroad tracks built upon the land were also largely for the purpose of hauling this stave timber to the mills and from the mills to the railroad station for loading.    The timber remaining upon the land was such timber as it was expected to remove by hauling the same to floatable streams by means of which it could be carried to its destination.    It appears that a large part of this class of timber which had been theretofore cut had been carried to market in this way. It must be borne in mind that the deed from the Bennetts to the Cooperage Company conveyed the timber on this 27000 acres of land.    It vested the title to this timber in the Cooperage Company.    Of course, in order to have the benefit of that title it was necessary that the timber be all cut before the first of January, 1925, because the deed provides that after that date all timber remaining upon the land shall revert to and become the property of the grantors.    Are the facts shown in this case sufficient to prove an abandonment by the Cooperage Company ?    That there is a large amount of valuable timber still remaining upon the land is unquestioned; that the Cooperage Company, in the spring of 1918, had negotiated the sale  of this timber to Snodgrass and only waited to consummate this sale until it could relieve itself of the Vansent Kitchen & Company contract is undisputed.    The taking

up of the tracks and the moving of the mills do not necessarily indicate that the Cooperage Company had disclaimed any title to the remaining timber.     It is contended that the request to the assessor not to carry the timber upon the land books for the year 1918 in the name of the Cooperage Company because it had already been removed, conclusively shows that it had abandoned whatever rights it had upon the land. The officers of the Cooperage Company say that they did not know that the tax return contained any such notation.     It was made upon the return of personal property made by the company in a place where no one would have reason to expect such a notation to be made, and the officers of the company say that if they had known that any such return had been made they would have disapproved it and disallowed it. Whether this is true or not, we do not think is material. The failure of an owner of property to return it for taxation is not of itself sufficient evidence to show that he has disclaimed title to the property.     It is common knowledge that many citizens sucessfully escape the payment of the taxes which they should pay, but this fact has never been held sufficient to divest them of the title to the property upon which they had not paid taxes and vest it in someone else who might be fortunate enough to secure the temporary possession of it.

Another ground relied upon by the plaintiffs to show abandonment by the Cooperage Company is that it cut over all of this land, sometimes more than once.     This is quite true. The Cooperage Company had cut over practically all of the land so far as the stave and heading timber was concerned.     The evidence shows that its method of removing the timber was to go over a tract of land first and cut out the stave and heading timber; then it frequently went over it again and cut out the poplar timber; and still again and cut out the hickory suitable for spokes and handles; and frequently again, and cut out telegraph and telephone poles and other classes of timber.     This process was carried on during all of the time it was engaged in its operations, and no objection to conducting the operations in this manner were ever made by any of the interested parties, nor could any objection be made upon that account.     There was nothing in the deed which

required the Cooperage Company to remove all of the timber from a particular tract of land as its operations progressed. The case of *Koontz* v. *Mabie,* 72 W. Va. 202, is relied upon to support this contention of the plaintiffs. The contract in that case required the purchaser to cut the timber off clean as he went over it, and as construed by the court did not permit him to go back over the land and cut further timber after it had once been cut over and operations discontinued thereon. There is no such requirement as that in the contract in this case, and the conduct of the parties in carrying on their operations shows that they did not so construe it.    We are of the opinion that the court below was right in his holding that there was no abandonment by the Cooperage Company of its rights under the timber deed, and that whatever timber it had the right to cut thereunder was transferred to and became vested in Snodgrass.

The plaintiffs, however, insist that the decree of the lower court is right for the reason that according to their construction of the timber deed it must be considered that the lands required to be surrendered each year were automatically surrendered, and this being so there would only remain a little over 8000 acres of the land to be cut over by Snodgrass at the time of the transfer to him.    It might be pertinent to inquire what 1500 acres was surrendered each year.    There is no particular 1500 acres of land described in the deed to be surrendered each and every year, nor is there any way pointed out by which the court could ascertain which 1500 acres the purchaser of the timber was required to surrender. It may be doubted whether, if Bennett had attempted to compel the specific execution of the contract in this regard, he could have been successful, for the reason that the subject matter of the surrender each year is not determined by the contract itself, nor is there any method pointed out for the determination of this acreage except the action of the parties. It may be that this provision in the deed is no more than a condition for the violation of which an action at law might be maintained.    Our view of the case, however, renders it unnecessary for us to pass upon this question.    The defendants insist that Bennett waived this provision of the contract:

First, by accepting the surrender in 1913 of the 7000 acres under the circumstances existing at that time; and, Second, by his subsequent conduct in not asking for further surrenders, but in virtually foregoing this provision of the contract in consideration that he be not required to furnish certain rights-of-way which the company was insisting he was under obligation to furnish. As before stated, Bennett never demanded performance of this part of the contract until the year 1913, when the deed surrendering a little over 7000 acres was delivered.     In this deed a provision was inserted that it should not prejudice the rights of either of the parties to rely upon any provision of the contract which had not been complied with, and in a letter from Bennett in regard to this provision he advised the company that he did not expect to have any occasion to rely thereon, but simply put it in so that in case the company undertook to be harsh or unreasonable with him in the final settlement he might use it against it.     After this time he made no further requests for surrenders of any of the property until 1916, when, as above indicated, he attempted to have further acreage relieved from the burden of the timber deed without being required to make additional surveys.     When the conclusion was finally reached that this could not be done without such additional surveys it appears that Bennett did not require the same.     In fact the Cooperage Company advised him that it was ready to have the surveying done if he desired it, so that it could surrender the acreage in accordance with the terms of the deed. The cost of such surveying was to be borne by the Bennetts, and it was but reasonable that the Cooperage Company before incurring this expense should get the consent of the Bennets thereto.     When the Cooperage Company in effect applied for this, Bennett remained silent, and further in the next year when the contention between the parties arose over the rights-of-way Bennett put his own construction upon his conduct when he said that his leniency in not enforcing the surrenders, and the fairness and accommodation of the company to him, should offset each other and settle all such matters.     This was in effect saying to the company, I had a right to demand of you that you surrender 1500 acres of this land each year

free from the burden of the timber deed. You have a right to require of me that I procure certain rights-of-way. I have relieved you of the requirement to surrender the 1500 acres each year, and in consideration of this you should relieve me of the duty of procuring these rights-of-way. The company by its acquiescence accepted the proposition and that was the end of the matter. There is no doubt but that the Bennetts might waive this requirement if they desired, and that they did waive it there seems to us no doubt. In addition to the correspondence which culminated in the letter above referred to, there is much proof here of conversations had by Louis Bennett with various people in which he stated that the rights of the Cooperage Company would not be extinguished until 1925. It was testified by some witnesses that when they talked with Bennett about these surrenders he expressed a preference that the matter be allowed to remain as it was until the expiration of the time provided in the deed for removing the timber. We do not think, therefore, that either the Bennetts, or any of those claiming under them, had any right to demand the surrender of the timber upon any of this land at the time of Louis Bennett's death. Whether such a right once waived can again be restored as to the future by making demand we need not say. The surrender deed tendered by Snodgrass and Turner, admitting that it only covers the acreage claimed by the Bennetts, is sufficient to fully meet any requirements for surrender of territory up to that time. At the time the Bennett suit was brought it may be said that there was no right to demand the surrender of any of the territory. The conditions which the Bennetts required of Snodgrass and Turner they had no right to demand, that is, that they retain only 8000 acres of the land, and that in this 8000 acres the whole of any tract must be included upon which they had cut any timber, however insignificant the extent of such cutting might be. The plaintiffs in the seven last above named suits can, of course, stand on no higher ground than their grantors. They took deeds to the land conveyed to them containing a provision that the same was subject to all of the rights of the Interstate Cooperage Company under its deed of July, 1906, and they cannot com-

plain that their land has not been relieved of the burden cast thereon by this deed in advance of the time indicated therein for the expiration of the Cooperage Company's rights.

Our conclusion is to reverse all of the decrees complained of, dissolve the injunctions, and dismiss the bills in the seven last above named causes, with costs to the appellants in this court, and in the court below; and as to the first above named cause, it is remanded for the purpose of having the special receiver therein appointed make settlement of his accounts, with directions to thereupon discharge such special receiver and dismiss the suit.

*Reversed; Injunctions dissolved; Remanded.*